**RAINES FELDMAN LITTRELL LLP**
Kyra E. Andrassy (State Bar No. 207959)
*kandrassy@raineslaw.com*
Robert S. Marticello (State Bar No. 244256)
*rmarticello@raineslaw.com*
Stephen M. Mott (State Bar No. 362642)
*smott@raineslaw.com*
4675 MacArthur Court, Suite 1550
Newport Beach, CA 92660
Telephone: (310) 440-4100
Facsimile: (310) 691-1943

Counsel for Debtor-in-Possession
Raymond Group, LLC

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>RAYMOND GROUP, LLC,<br><br>Debtor-in-Possession. | Case No.: 8:26-bk-10834-SC<br><br>Chapter 11<br><br>**MOTION PURSUANT TO 11 U.S.C. § 363(b) TO ENTER INTO PROPERTY MANAGEMENT AGREEMENT WITH R & K INTERESTS, INC. DBA INVESTORS' PROPERTY SERVICES AS PROPERTY MANAGEMENT COMPANY EFFECTIVE JUNE 1, 2026; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF HOWARD GROBSTEIN IN SUPPORT THEREOF**<br><br>[No Hearing Required Pursuant to Local Bankruptcy Rule 9013-1(o)] |

**TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND ALL INTERESTED PARTIES:**

Raymond Group, LLC, the debtor and debtor-in-possession (the "**Debtor**"), hereby seeks Court approval to employ R & K Interests, Inc. dba Investors' Property Services ("**IPS**") as its property management company (the "**Motion**") in the above-captioned bankruptcy case pursuant to 11 U.S.C. § 363(b), effective as of June 1, 2026. In support of the Motion, the

Debtor submits the following memorandum of points and authorities and the declaration of Howard Grobstein in support thereof, and respectfully represents as follows:

## I. <u>BACKGROUND</u>

On March 18, 2026 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned case. The Debtor is operating as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this case and no official committees have been appointed or designated. This case constitutes a single asset real estate case.

The Debtor is a special purpose entity that owns and operates a commercial strip mall located at 104-172 Raymond Avenue, Fullerton, CA 92831 (the "**Property**"). The Property has 10 tenants, including Planet Fitness, Grocery Outlet, and Polly's Pies, and is fully leased. It generates monthly income of approximately $178,000.

The Property has two liens against it: (1) a first priority lien in favor of Bank of America to secure a loan with an approximate balance of $16,700,000; and (2) a second priority lien in favor of Nano Banc that secured a debt with an approximate balance of $3,970,000. Based on a broker opinion of value from June 2024, the Debtor believes that the Property is worth from $25,780,000 to $27,800,000 although the Debtor is in the process of getting a current broker opinion of value.

Nano Banc recorded a notice of default and a sale was scheduled for the afternoon of March 18, 2026. After negotiations with Nano Banc broke down, the Debtor filed its chapter 11 petition to stay the foreclosure sale. The filing of the case also stayed litigation pending between Nano Banc and the Debtor in Orange County Superior Court.

In order to guide the Debtor through its chapter 11 and because of allegations of misconduct by former management for the Debtor, it was determined that retaining Howard Grobstein as the Debtor's manager for the pendency of this case would be in the best interests of all concerned. His appointment became effective April 16, 2026. In order to fully sever

ties with former management, because of concerns about how the Property had been maintained under former management and the former property manager, and to provide assurances to the Debtor's secured creditors that the Property is being properly managed, the Debtor terminated the services of Vierergruppe and retained IPS as the new property manager effective June 1, 2026. Tenants have been notified of the change. IPS is a well-qualified property manager with a significant amount of experience in distressed situations and with retail centers. Its company profile is attached as Exhibit "1."

## II. <u>PROPOSED EMPLOYMENT</u>

As set forth in the proposal from IPS that is attached as Exhibit "2," IPS will provide the following services:

**1. Property Management Services.**

a. As appropriate, to work with the Debtor to improve income and operations including a Competitive Market Analysis, Property Position Analysis, and rehab and capital recommendations.

b. Negotiate all vendor contracts as needed.

c. Establish a maintenance work order and documentation system.

d. Prepare and distribute general correspondence.

e. Supervise and regularly inspect all ongoing on-site building operations.

f. Obtain required licenses.

g. Review site level safety and security programs.

h. Obtain any needed on-line processing accounts.

i. Comply with local, state and federal laws and regulations.

j. Provide 24-hour 365 days per year emergency phone contact.

k. Collect and bank revenues and voucher and disburse all vendor invoices.

l. Document operations in a detailed monthly narrative of property operations along with financial report and provide to owner and related parties.

m. Provide weekly key issue status updates to manager/owner as/if requested.

**2. Financial Documentation and Services.**

a. On a monthly basis, IPS will provide the owner with a financial statement that details the month and year to date activity in the areas of collections, disbursements, delinquencies, and receivables/payables account status. The financial package includes:

- Income & Expense Statement
- Balance Sheet
- Budget Comparison Variance Report
- General Ledger and Supporting Journals
- Check Disbursements Record
- Monthly Accounts Receivable Analysis
- Aged Delinquency Analysis
- Bank Account Reconciliation
- Bank Statement(s)

b. Implement an expense documentation policy. Paid expenses will be detailed on the expense and check registers as part of the financial statement report completed each month.

**3. Due Diligence and Sale Preparation.**

a. Assist in the compilation of a due diligence package for brokers including copies of contracts, licenses, tax bills, historical operating data, inventory, leases, and other pertinent materials for sale.

b. Engage or coordinate as needed with brokers and potential purchasers.

c. Engage or coordinate as needed with environmental assessment firms.

d. Engage or coordinate as needed with tax appeal firms.

**4. Client Relations.**

a. Provide takeover reports.

b. Provide weekly update reports.

c. Provide monthly operating reports.

d. Provide rapid responses to questions or requests from asset manager.

e. Establish and complete an effective system of communication between site level information and asset manager and ultimate disposition personnel.

## III. PROPOSED COMPENSATION

As set forth in the Property Management Agreement attached as Exhibit "3," IPS will receive the following compensation, subject to the consent of the secured creditors or the authorization of the Court for the Debtor to use cash collateral:

| Fee Type | Fee Amount/Percentage |
|---|---|
| Management Fee | The first 90 days will be $5,000 a month, and thereafter will be 4.0% of gross income or $4,000 a month, whichever is greater. |
| One Time Set-Up Fee | $3,000 |
| IPS Roving Maintenance Personnel | $75/hour |
| Bookkeeping Services | Included |
| Copying & Postage | Included |
| Mileage | IRS rate |
| Leasing | If needed, recommend outside broker for any vacant space. IPS will handle lease renewals as/if needed @ 2% commission or $1,000 minimum. |
| Due Diligence or Sale Coordination Fee | $2,000 (if applicable). In the event the property is sold and IPS is tasked with providing due diligence information and coordination with brokers and buyers, a sale coordination fee will be charged to compensate IPS for time required above and beyond normal property management operations. |

## IV. LEGAL ARGUMENT

Section 363 of the Bankruptcy Code provides, in relevant part, that a debtor in possession "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate[.]" 11 U.S.C. § 363(b)(1). Under applicable case law, courts will approve a debtor's proposed use of its assets under section 363(b)(1) of the Bankruptcy Code if it represents a sound business purpose on the part of the debtor. *See, e.g., Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19–20 (B.A.P. 9th Cir. 1988); *In re Montgomery Ward Holding Corp*., 242 B.R. 147, 153 (Bankr. D. Del. 1999) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represent a 'business judgment test.'"); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (courts defer to a trustee's judgment concerning use of property under section 363(b) when there is a legitimate business justification). Although the Debtor believes that the employment of a property manager is in the ordinary course of its business, the Debtor is erring on the side of seeking approval. In addition, Court approval is being sought so that there is a Court order in IPS's employment, which is something some tenants have requested be provided.

Employment is not being sought under § 327 because most courts hold that a property manager is not a professional within the meaning of that section. *See, e.g.*, *In re Park Ave. Partners L.P*., 95 B.R. 605, 616-17 (Bankr. E.D. Wis. 1988); *In re Melbourne Beach, LLC*, 2020 WL 5745938 *3-*4 (Bankr. M.D. Fla. 2020).

The Debtor believes that the retention of IPS is in the best interests of the estate and a proper exercise of its business judgment. IPS has provided property and asset management services since 1980 and is an Accredited Management Organization with a significant bench of experience with distressed properties. The Debtor does not believe that the Property has been properly managed in the past, although whether the cause of that is former management or the former property manager, or some combination of both, is unclear. IPS is managing a couple of other properties that were previously affiliated with Continuum Analytics and which also previously utilized Vierergruppe Management and has gained the trust of the secured

creditors in those cases. With the exception of the slightly higher rates for the first three months, IPS's fee is comparable to that of Vierergruppe, which charged the higher of 3.5% of gross monthly collections or $1,000 a month, whichever was higher. Having a top notch property manager will be important to realizing value from the Property as the Debtor prepares to market it for sale. Payment of the property management fees will be subject to either the consent of the secured creditors or a Court order authorizing the Debtor to use cash collateral. The Debtor, through its new manager, is in the final stages of preparing 13-week cash flow projections in order to obtain this authority.

## V. <u>CONCLUSION</u>

WHEREFORE, the Debtor requests that the Court enter an order:

1. Authorizing the Debtor to enter into the Property Management Agreement with IPS pursuant to 11 U.S.C. § 363(b);

2. Subject to either the consent of the secured creditors or Court order authorizing the Debtor to use cash collateral, authorizing the Debtor to pay IPS the compensation provided in the Property Management Agreement on a monthly basis; and

3. Granting such other relief as the Court may deem just and appropriate.

Dated: June 30, 2026

**RAINES FELDMAN LITTRELL LLP**

By: */s/ Kyra E. Andrassy*
Kyra E. Andrassy
Counsel for Raymond Group, LLC

**DECLARATION OF HOWARD GROBSTEIN**

I, Howard Grobstein, declare as follows:

1. Effective April 16, 2026, I am the Manager for Raymond Group, LLC, the debtor and debtor-in-possession in the above captioned case. I know each of the following facts to be true of my own personal knowledge, except as otherwise stated and, if called as a witness, I could and would competently testify with respect thereto. I make this declaration in support of the *Motion Pursuant to 11 U.S.C. § 363(b) to Employ R & K Interest dba Investors' Property Services as Property Management Company Effective June 1, 2026* (the "**Motion**"). Unless otherwise defined in this declaration, all terms defined in the Application are incorporated herein by this reference.

2. On March 18, 2026 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is a special purpose entity that owns and operates a commercial strip mall located at 104-172 Raymond Avenue, Fullerton, CA 92831 (the "**Property**"). The Property has 10 tenants, including Planet Fitness, Grocery Outlet, and Polly's Pies, and is fully leased. It generates monthly income of approximately $178,000.

3. The Property has two liens against it: (1) a first priority lien in favor of Bank of America to secure a loan with an approximate balance of $16,700,000; and (2) a second priority lien in favor of Nano Banc that secured a debt with an approximate balance of $3,970,000. Based on a broker opinion of value from June 2024, the Debtor believes that the Property is worth from $25,780,000 to $27,800,000 although I am in the process of obtaining an updated broker opinion of value.

4. Nano Banc recorded a notice of default and a sale was scheduled for the afternoon of March 18, 2026. After negotiations with Nano Banc broke down, the Debtor filed its chapter 11 petition to stay the foreclosure sale. The filing of the case also stayed litigation pending between Nano Banc and the Debtor in Orange County Superior Court.

5. I was retained as the Debtor's manager because of concerns about former management of the Debtor. Counsel for the Debtor's secured creditors in this case and some

other cases that were previously affiliated with Continuum Analytics, have raised concerns about the state of the properties. I toured the Property and understand these concerns. There is a significant amount of deferred maintenance and tenants have expressed frustration with the state of the Property. I also have concerns about the accuracy of some of the information that has been provided to me, including the accuracy of basic information such as the rent roll. In order to fully sever ties with former management, concerns about how the Property has been maintained under former management and the former property manager, and to provide assurances to the Debtor's secured creditors that the Property is being properly managed, I caused the Debtor to terminate the services of Vierergruppe and retain IPS as the new property manager effective June 1, 2026. IPS notified tenants of the change. IPS is a well-qualified property manager with a significant amount of experience in distressed situations and with retail centers. IPS's company profile is attached as Exhibit "1." A true and correct copy of its proposal is attached as Exhibit "2" and a true and correct copy of its agreement is attached as Exhibit "3."

5. I believe that the retention of IPS is in the best interests of the estate and a proper exercise of my business judgment. Based on what I have reviewed and on my own site visit, I do not believe that the Property has been properly managed in the past, although whether the cause of that is former management or the former property manager, or some combination of both, is unclear. IPS is managing a couple of other properties that were previously affiliated with Continuum Analytics and which also previously utilized Vierergruppe Management and has gained the trust of the secured creditors in those cases. With the exception of the slightly higher rates for the first three months, IPS's fee is comparable to that of Vierergruppe, which charged the higher of 3.5% of gross monthly collections or $1,000 a month, whichever was higher. Having a top notch property manager will be important to realizing value from the Property as the Debtor prepares to market it for sale. Payment of the property management fees will be subject to either the consent of the secured creditors or a Court order authorizing the Debtor to use cash collateral. Having

finally received the Debtor's QuickBooks files, we are now in the final stages of preparing 13-week cash flow projections in order to obtain this authority.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 28 day of June, 2026 at Woodland Hills, California.

Howard Grobstein

# EXHIBIT 1



INVESTORS'
PROPERTY SERVICES

# COMPANY PROFILE



# ABOUT US

## 46 YEARS OF LEADERSHIP EXPERIENCE

With 46 years of industry leadership, we specialize in real estate properties across the West Coast and Southern states, delivering tailored solutions that prioritize client goals and objectives. Our comprehensive suite of services, including meticulous **management and supervisory oversight**, diligent **administrative support**, robust **financial management**, proactive **leasing and marketing** efforts, and expert **construction management**, is designed to provide unparalleled value and performance. We are dedicated to exceeding expectations, fostering enduring resident/tenant relationships, and driving sustainable growth for our clients. Our mission is to provide a personalized, hands-on approach that ensures every property receives the attention and care it deserves, solidifying our position as leaders in the industry. At Investors' Property Services, we “think like an owner” while providing our clients with a superior property management experience.

With over 200 employees, IPS’ experience base extends to such diversified real property assets as conventional and tax credit multifamily, senior housing, student housing, office, retail, and hotel/motel.

IPS’ responsible and experienced management staff comprehends the value of building appearance as well as operating efficiency, and are familiar with **quick property takeovers, inventories, staff & payroll, budget preparations, and marketing plans** – especially in the difficult environments associated with turnaround and value-add management. Further, our staff is skilled in evaluating value rehab opportunities and in preparing schedules and analyses to support such plans. It has assumed management of large multi-state portfolios and is **experienced in complex operations**.

The company is a **licensed California general contractor** and offers construction management services nationwide.



# HISTORY

**1980** Founded in Orange County, California by Robert C. Warren II bringing his vision of exceptionally responsive, flexible, and adaptable property management services to the Southern California marketplace.

**1988** In addition to its private client management portfolio, IPS develops a significant presence in the distressed asset and fiduciary management ecosystem driven by its court appointment to a large Southern California portfolio.

**1996** Warren II is co-founder of the California Receiver's Forum.

**2000** Expands presence into multiple neighboring states with a variety of institutional clients.

**2003** Warren III assumes day-to-day management following the passing of Warren II and IPS begins to further expand its national management presence throughout the western and southern states.

**2009** IPS grows to 10,000 units after it's assigned a bankruptcy appointment to manage nearly 5,000 units in 3 states.

**2012** Through its affiliate relationships IPS becomes actively involved in the overall arc of real estate acquisition and disposition including due diligence, underwriting, structure, financing and purchase/exit strategies.

**2020** Celebrates 40 years of operations!

**2026** Celebrates 46 years of operations!



# PROPERTY MANAGEMENT

## 1. PROPERTY MANAGEMENT SERVICES

- Set in Motion a Management Plan to improve income and operations including a Competitive Market Analysis, Property Position Analysis, and rehab and capital recommendations.
- Evaluate site-level software system and implement new one if needed.
- Negotiate all vendor contracts as needed.
- Establish maintenance work order and documentation system.
- Obtain or verify property insurance policy and assist with any claims.
- Prepare and distribute general correspondence.
- Supervise and regularly inspect all ongoing on-site building operations.
- Obtain required licenses.
- Review site-level safety and security programs.
- Obtain needed credit card processing accounts (if applicable).
- Comply with local, state, and federal laws and regulations.
- Provide 24-hour 365 days per year emergency phone contact for on-site personnel.
- Collect and bank revenues and vouchers and disburse all vendor invoices.
- Document operations in a detailed monthly narrative of property operations along with financial reports and provide to the owner and related parties.
- Provide weekly key issue status updates to the asset manager/owner as/if requested.

## 2. PERSONNEL SERVICES

- Employ all on-site personnel under Investors' Property Services and assume all employment and employer responsibilities including tax compliance and workers compensation coverage.
- Hiring and compliance practices set and monitored by Investors' Property Services corporate policy.
- Access to IPS strategic benefit packages including medical, dental, life, paid leave, 401(k), health savings account, and wellness programs which help to attract and retain talent.
- Opportunities for advancement to attract and retain talent.
- Structured policies for progressive discipline and terminations.
- Employment practices coverage and responsibility.

# 3. FINANCIAL DOCUMENTATION & SERVICES

- On a monthly basis, IPS will provide the owner with a financial statement that details the month and year-to-date activity in the areas of collections, disbursements, delinquencies, and receivables/payables account status. The financial package includes:
    - Income & Expense Statement
    - Balance Sheet
    - Budget Comparison Variance Report
    - General Ledger and Supporting Journals
    - Check Disbursements Record
    - Monthly Accounts Receivable Analysis
    - Aged Delinquency Analysis
    - Bank Account Reconciliation
    - Bank Statement
- Implement an expense documentation policy. Paid expenses will be detailed on the expense and check registers as part of the financial statement report completed each month.

# 4. MARKETING SERVICES

- IPS will run a complete analysis of the existing marketing plan and based on the market and budget, will implement all or part of the following:
    - Traditional media (print and radio).
    - Search Engine Optimization and Pay Per Click strategies.
    - ROI-based spending on Internet Listing Services.
    - Complete evaluation of online reputation and implement a plan/technologies to drive improvement.
    - Rebranding consistent with the client portfolio.
    - Establish internal in-house advertising media (tangible collateral).
    - Evaluation of website and implement integrated technologies.
    - Implementation of sales training programs for site-level employees.

# 5. DUE DILIGENCE & SALE PREPARATION SERVICES

- Assist in the compilation of a due diligence package for brokers including copies of contracts, licenses, tax bills, historical operating data, inventory, leases, and other pertinent materials for sale.
- Engage or coordinate as needed with brokers and potential purchasers, environmental assessment firms, and tax appeal firms.

# 6. CLIENT RELATIONS

- Provide
    - Takeover Reports
    - Operating Reports
    - Weekly Update Reports
- Rapid responses to questions or requests from owners or asset managers.
- Establish and complete an effective system of communication between site-level information and owner or asset manager and ultimate disposition personnel.

# ASSET MANAGEMENT AND ADVISORY SERVICES

**IPS has a broad base of experience through its affiliates and clients in managing the full life span of real estate property investment: acquisition, operations, and disposition. As a result, apart from its typical property management services, it can offer advisory expertise including:**

- Long-term business plans and exit strategies including repositioning models to maximize value and cash flow.
- Due diligence, negotiation and purchase strategies.
- Operating agreement development and compliance.
- Asset valuations.
- Refinancing for existing loans and/or recapitalization
- Projection of returns by investor tranche.
- Sale of the property.



INVESTORS' PROPERTY SERVICES

# SPECIALIZATIONS

## VALUE ADD

Underperforming assets are prime acquisition targets for investors. Sometimes owners own properties that are not performing optimally. Such properties may have low occupancy rates, outdated amenities, deferred maintenance, or other challenges affecting their overall success. IPS is well equipped to evaluate untapped potential wherein specific improvements can lead to increased rental income and property value.

IPS has engaged in evaluating and creating business plans that improve performance by developing forecasts, modeling future cash flows and property values, and executing the business plan. Market conditions, location, and property-specific factors play a significant factor in a value-add strategy and determining the success and risks involved.

## INDEPENDENT LIVING

Operating senior independent living facilities presents distinctive challenges to the owner and operator. Many facilities include food and beverage services, transportation services, and concierge/event planning. Organizing events and activities does enhance the quality of life and it fosters neighborhood engagement. In terms of operations, ensuring cost-effective staff levels and the appropriate skill levels to meet resident needs is crucial. Retaining quality care providers and continuity in administrative personnel is essential to adapting and responding to the diverse group of needs in senior housing. Moreover, senior facilities require a focused approach to marketing the facility, building familiarity within the local community, and establishing brand recognition. The very nature of this unique resident mix brings higher turnover than in typical multifamily properties. Residents do age into higher levels of care that require moves to assisted living or skilled nursing facilities. IPS understands this dynamic, and it brings a holistic approach to its senior care management by establishing the right operating culture and operating team and by crafting brand awareness and identity.

## HYBRID OPERATING STRUCTURE

Property management means flexibility. Certain owners may prefer to be the direct operator on a day-to-day basis – but do not want to wrestle with the details of the monthly accounting nor the employment and liability of the site-level personnel. IPS has developed a unique program where it takes on these responsibilities while the owner performs the day-to-day management, resulting in a lower-cost operating model.

In such a hybrid setup, effective communication is paramount. IPS has designed a program and process with dedicated accounting and HR team members with proven results.

## RECEIVERSHIPS

Having been successfully appointed in hundreds of receiverships over the past 35 years, IPS specializes in rents and profits receiverships (those involving income properties). The property management skill set IPS brings to a receivership case is invaluable. Not only can it immediately assume day-to-day operations and the employment of any site-level personnel, but it can also engage its processes and industry relationships to quickly stabilize an asset. Moreover, it can collaborate with both the defendant and plaintiff to create - and even fund - a management plan to improve operations and/or sell the property. In those instances, wherein a lender forecloses, IPS can either continue the work it has begun during the receivership or, if there was no prior receivership for the property, begin the same turnaround process while assisting in compiling due diligence materials for the timely disposition of the asset.

# MEET THE PRESIDENT

# ROBERT WARREN III



*I am so proud of our company. What a pleasure it has been to watch it grow over the past 46 years. In fact, some 46 years ago three of us were working in a one room office with green ledger sheets and no computers! Today we still work to reflect that small boutique, creative, hands-on, and responsive property management experience - even though we now have over 200 employees across multiple states interacting with the newest and best technologies. Despite our longevity and growth, I am most proud of our corporate culture. We originally formed to and still strive to generate an ethical environment that communicates respect both internally and externally. We work to convey those values to our team, our tenants, and our vendors. And within that framework, we find ourselves driven to respond to and meet the goals and objectives of our most important relationships: our clients. I know I speak for all of us in expressing that we would be most pleased to have the opportunity to explore a new client relationship with you.*

Robert C. Warren, III has been managing income property portfolios and businesses for over 30 years. He has directed on a national basis the management of over 70,000 multifamily units, more than 10 million square feet of commercial and retail space, and over 75 limited and full-service hotels and motels. Mr. Warren has a proven record in property evaluation and re-positioning, budgeting, forecasting, and asset maintenance and preservation. He holds a master's degree in business administration and is a certified Property Manager (CPM®) and has taught property management at California State Polytechnic University, is the past co-chair of the Los Angeles/Orange County chapter of the California Receiver's Forum and past President of the Institute of Real Estate Management Orange County Chapter #91.

## OUR TEAM

### ACCESSIBILITY TO LEADERSHIP
### 25+ YEAR AVERAGE TENURE



### KYLE WARREN

EVP, INFORMATION SECURITY OFFICER

- 949.900.6163
- kyle.warren@investorshq.com



### JIM KOTMAN

CONTROLLER

- 949.900.6187
- jim.kotman@investorshq.com



### JENNY SILVERMAN

PORTFOLIO MANAGER

- 949.900.6175
- jenny.silverman@investorshq.com



### BO JONES

VICE PRESIDENT OF OPERATIONS

- 949.900.6180
- bo.jones@investorshq.com



### VERONICA RAMIREZ

DIRECTOR OF HUMAN RESOURCES

- 949.900.6186
- veronica.ramirez@investorshq.com



### JENNIFER CLENARD

DIRECTOR OF ADMINISTRATION

- 949.900.6169
- jennifer.clenard@investorshq.com



### TODD EDWARDS

REGIONAL DIRECTOR

- 949.900.6170
- todd.edwards@investorshq.com



### SHERRY RANDALL

REGIONAL MANAGER – TEXAS

- (936) 554-1228
- sherry.randall@ipsapts.com



CURRENT ASSETS

HISTORICAL ASSETS

# FEATURED PROPERTIES

www.emersonpines.com



www.thehirshcollective.com



www.aspensathollysprings.com



www.valenciagrovehtx.com



www.echelonphoenix.com



www.casalunatx.com



INVESTORS' PROPERTY SERVICES

# CLIENTS

# ACCREDITATIONS & AFFILIATIONS

Investors' Property Services is active at the local, state, and national levels. Association involvement is essential in effectively maximizing real estate investment value.

Robert Warren II co-founded the California Receivers Forum and current president Robert Warren III is past co-chair of the Los Angeles / Orange County chapter. IPS is an Accredited Management Organization AMO®.

INVESTORS' PROPERTY SERVICES

# WHY IPS?

A boutique experience with direct access to a responsive and accessible senior leadership team.

We have experience in successfully managing over 500 real estate receivership cases in over 20 states

We think like an OWNER. Achieved success in managing over 70,000 multifamily units, 15 million square feet of commercial space, and over 75 limited and full-service hotels

# CONNECT WITH US

949.900.6180

Bo.Jones@investorshq.com

www.investorshq.com

26300 La Alameda, Suite 240
Mission Viejo, CA 92691



# EXHIBIT 2

# Management Proposal

## Raymond Group LLC
## Fullerton Square Retail Center

**Prepared by;**
**Robert Warren**
**President**
**Jenny Silverman**
**Senior Property Manager**
**949 900 6161**
**Robert.Warren@investorshq.com**

5/21/2026

Fullerton Square
104-172 North Raymond Avenue
Fullerton, CA 92831



**I. PROPOSAL TASK OVERVIEW AND FEE STRUCTURE**

**II. COMPANY QUALIFICATIONS**

- **A. IPS Specific Qualifications to Operate Fullerton Square as Property Manager**
- **B. IPS *Substantial* Experience Base**
- **C. Appropriate Insurance**
- **D. Accreditation and Certifications**

**III. SCOPE OF SERVICES**

- **A. Property Management**
- **B. Personnel**
- **C. Financial**
- **D. Operational Marketing**
- **E. Due Diligence and Sale Preparation**
- **F. Client Relations**

## I. TASK OVERVIEW AND SPECIFIC FEE STRUCTURE

R & K Interests, Inc. DBA Investors' Property Services ("IPS"), founded in 1980, is comprised of a team of professionals in the management and value enhancement of real estate. Its **45 plus year** track record in serving a variety of institutional clients and its specific management experience in similar Class B & C retail centers.

The company and its personnel familiar with quick property takeovers, inventories, staff analyses, budget preparations and marketing plans in the difficult environments associated with distressed assets – especially those subject to bankruptcy court or state court receivership actions. The company has assumed management of large multistate portfolios and has managed well over 500 different assets subject to court oversight.

Having reviewed the information regarding the 78,849 SF neighborhood retail center, and given its low reported occupancy level and reported lack of maintenance and expected corrective tasks, IPS proposes to act as property manager with the following proposed fee is as follows:

- Management Fee — 4% of income vs. a monthly minimum
  $6,000 minimum first three months
  $4,000 minimum thereafter
- Set-Up Fee — $3,000
- IPS Roving Maintenance Personnel — $75/hour
- Bookkeeping Services — Included
- Copying & Postage — Included
- Mileage — IRS rate
- Leasing — Recommend outside broker for any vacant space. IPS will handle lease renewals as/if needed @ 2% commission or $1,000 minimum.
- Due Diligence or Sale Coordination Fee — $2,000 (if applicable). In the event the property is sold and IPS is tasked with providing due diligence information and coordination with brokers and buyers, a sale coordination fee will be charged to compensate IPS for time required above and beyond normal property management operations.

## II. COMPANY QUALIFICATIONS

### A. IPS HAS SPECIFIC QUALIFICATIONS FOR FULLERTON SQUARE

IPS is well qualified to manage the property due to the following:

1. IPS has a substantial property management experience base and has approximately 225 employees. Many of these long-term employees are capable real estate professionals equipped with years of experience and who are certified professionals in the field. It has established relationships with vendors and key suppliers of market information in the industry.

2. IPS is headquartered in California with a long and successful track record in major metro markets of California the last 30 years and is actively managing assets in California, Arizona, and Texas.

3. IPS has in place the necessary insurance to protect itself, its employees, and the institutional entity as it pertains to errors and omissions, general liability, workers compensation and employment.

4. IPS has expertise with the fiscal management for the property including preparation of detailed and accurate financial reporting, detailed operating analyses including line by line budgets and forecasts, market reporting including calculation of market share and recommendations for improving occupancy. In addition, IPS has developed site-specific procedures which are designed to optimize the management effectiveness and profitability of the property.

**B. IPS HAS SUBSTANTIAL MANAGEMENT EXPERIENCE BASE**

IPS has substantial management experience with the following specific property types:

1. Over 30,000 multifamily units ranging in single location size from 4 units to over 800 units; Its current portfolio is approximately 5,500 units in a variety of states.

2. Over 5 million square feet of commercial and retail space ranging in single location size from 5,000 sq. feet to over 200,000 square feet and including specialty business operations such as indoor swap meets, self-storage facilities and car wash/mini market operations.

3. Over 75 limited and full-service hotels and motels including restaurants and food and beverage operations. Property sizes in single location range from 20 units to 235 units including specific experience with franchise specialties such as Clarion, Hilton, Best Western, Ramada, Days Inn, Travelodge, Super 8, Econolodge, Howard Johnson's and Quality Inn.

4. Business operations including restaurant, lounge, manufacturing, and retail sales.

5. Commercial and residential condominium associations.

6. Residential care facilities for the elderly to 100+ beds.

7. Its seasoned and responsible management staff comprehends the value of building appearance as well as operating efficiency and are familiar with quick property takeovers, inventories, staff analyses, budget preparations and marketing plans – especially in the difficult environments associated with turnaround management assignments. IPS has a proven ability to work with agencies that have unique reporting requirements and its accounting staff has extensive experience with receipt and disbursement accounting, cash based, modified accrual and full accrual accounting.

8. The company services private clients as well as institutional clients

## C. IPS HAS APPROPRIATE AND ADEQUATE INSURANCE

IPS maintains a five million dollar general liability policy, a one million dollar workers' compensation policy, a one million dollar employment practices policy, a one million dollar errors and omissions policy, and a $1,000,000 fidelity bond.

## D. IPS HAS ACCREDITATION AND CERTIFICATION

The company is experienced, proven and credentialed. Investors' Property Services is an Accredited Management Organization (AMO®). The AMO® accreditation is the mark of distinction among real estate management firms. Only about 500 firms in the United and Canada have demonstrated the high level of professional competence to become AMO® firms. To earn the AMO® designation, a firm must meet the Institute of Real Estate management's strict criteria in professional education, ethics, business stability and financial standards. Combing the AMO® firm with a specialty in receivership and lender REO management services sets IPS apart from other management organizations.

Moreover, its personnel receive annual fair housing training and continue to hold and represent certification in the management industry and include such noted management designations as follows:

- Certified Property Manager (CPM®)
- Certified Commercial Investment Manager (CCIM®)
- Real Property Administrator (RPA®)

## III. SCOPE OF SERVICES

Investors' Property Services will apply its experience in property management as follows:

### A. PROPERTY MANAGEMENT SERVICES

- Set in Motion a Management Plan to improve income and operations including a Competitive Market Analysis, Property Position Analysis, and rehab and capital recommendations.
- Evaluate site level software system and implement new if needed (property level expense).
- Negotiate all vendor contracts as needed.
- Establish maintenance work order and documentation system.
- Obtain or verify property insurance policy and assist with any claims.
- Prepare and distribute general correspondence.
- Supervise and regularly inspect all ongoing on-site building operations.
- Obtain required licenses.
- Review site level safety and security programs.
- Obtain needed credit card processing accounts.
- Comply with local, state and federal laws and regulations.
- Provide 24-hour 365 days per year emergency phone contact for on-site personnel.
- Collect and bank revenues and voucher and disburse all vendor invoices.
- Document operations in a detailed monthly narrative of property operations along with financial report and provide to owner and related parties.
- Provide weekly key issue status updates to asset manager/owner as/if requested.

### B. PERSONNEL SERVICES

- Employ all on-site personnel under Investors' Property Services' through ADP TotalSource with salary and employers costs billed back to the property. IPS will assume all employment and employer responsibilities.
- Hiring practices are set by Investors' Property Services corporate policy. IPS will complete the interviewing and hiring of maintenance or field personnel, if applicable. All chosen applicants will be reviewed and approved by the Vice President of Property Management prior to hiring. Investors' is an equal opportunity employer and does not tolerate any form of discrimination.

### C. FINANCIAL DOCUMENTATION AND SERVICES

- On a monthly basis, IPS will provide the owner with a financial statement that details the month and year to date activity in the areas of collections, disbursements, delinquencies, and receivables/payables account status. The financial package includes:

  - Income & Expense Statement
  - Balance Sheet
  - Budget Comparison Variance Report
  - General Ledger and Supporting Journals
  - Check Disbursements Record
  - Monthly Accounts Receivable Analysis
  - Aged Delinquency Analysis
  - Bank Account Reconciliation
  - Bank Statement

- Implement an expense documentation policy. Paid expenses will be detailed on the expense and check registers as part of the financial statement report completed each month.

**D. DUE DILIGENCE AND SALE PREPARATION SERVICES**

- Assist in the compilation of a due diligence package for brokers including copies of contracts, licenses, tax bills, historical operating data, inventory, leases, and other pertinent materials for sale.
- Engage or coordinate as needed with brokers and potential purchasers.
- Engage or coordinate as needed with environmental assessment firms.
- Engage or coordinate as needed with tax appeal firms.

**F. CLIENT RELATIONS**

- Provide takeover reports.
- Provide weekly update reports.
- Provide monthly operating reports.
- Provide rapid responses to questions or requests from asset manager.
- Establish and complete an effective system of communication between site level information and asset manager and ultimate disposition personnel.

# EXHIBIT 3

# PROPERTY MANAGEMENT AGREEMENT

This **Property Management Agreement** ("Agreement") is made and entered into effective as of June 1, 2026 ("Effective Date") between **and R & K INTERESTS, INC., a California Corporation doing business as INVESTORS' PROPERTY SERVICES** ("MANAGER") **and RAYMOND GROUP, LLC, a California limited liability company** ("OWNER").

## RECITALS

A WHEREAS OWNER holds title to certain real properties and buildings, improvements and assets more particularly described on **Exhibit A** hereto (each a "Property" and if applicable collectively, the "Properties") consisting of retail and office product totaling approximately 78,849 sq ft., commonly known as Fullerton Square and located at:

104-172 North Raymond Avenue, Fullerton, CA 92831

B. WHEREAS Howard Grobstein, in his sole capacity as Manager in OWNER'S pending bankruptcy case No. 8:26-BK-10834-SC is now seeking to engage new property management services.

C. WHEREAS MANAGER and its staff are experienced and capable in the management and operation of retail centers that are similar in size and scope to the Properties.

D. WHEREAS OWNER desires to engage MANAGER to furnish to OWNER, and MANAGER agrees to furnish to OWNER, in accordance with the terms herein, the necessary technical, advertising, management and operating services described herein in order that the Properties will obtain the benefits deriving from the experience and capabilities of MANAGER in said activities.

## AGREEMENT

1. **Appointment and Acceptance**. To the extent herein provided and subject to the terms and conditions set forth herein, OWNER appoints MANAGER to manage, operate and maintain the Properties, and MANAGER accepts the appointment, subject to the terms and conditions set forth in this Agreement. In the absence of an agreement in writing between OWNER and MANAGER, no other tract or parcel of real property or the improvements thereon shall be subject to this Agreement.

2. **Term**. The term of this Agreement ("Term") shall commence on the Effective Date and shall terminate on the earlier to occur of: (i) the sale of the Properties or any portion thereof (in which event only as to such portion of the Properties sold); (ii) the termination of this Agreement pursuant to the terms hereof; or (iii) one (1) year from the Effective Date, provided that the Term be shall automatically renewed for successive one (1) year terms unless either party, upon delivery of written notice to the other party at least thirty (30) days prior to the expiration of the Term of its intention not to renew the Term.

3 **Approved Budgets**. If so required by OWNER, within the first 60 days of takeover and then every year, on or prior to October 15th, MANAGER shall prepare and submit to OWNER, in the form required by OWNER, an operating budget ("Operating Budget") and a capital budget ("Capital Budget" and together with the Operating Budget, collectively referred to herein as the "Budgets") for the promotion, operation, repair and maintenance of the Properties for the forthcoming calendar year.

MANAGER agrees to use diligence and to employ all reasonable efforts to ensure that the actual costs of maintaining and operating the Properties shall not exceed the Budgets, either in total or in any one line item within the chart of accounts. All expenses shall be charged to the proper line item contained within the chart of accounts and no expense may be classified or reclassified for the purpose of avoiding an excess in the annual budgeted amount of an accounting category. MANAGER shall secure OWNER's prior written approval for any expenditure, except for utilities charges, that will result in an excess of ten percent (10%) or more in any one line item within the chart of accounts of the Operating Budget; however, if said expenditure is cumulatively less than Three Thousand Dollars ($3,000.00), no approval is necessary. Notwithstanding the foregoing, during the OWNER's bankruptcy case, all expenditures shall be subject to either the consent of the OWNER's secured creditors or approval by the Bankruptcy Court and MANAGER acknowledges that the provision regarding an expense in excess of a line item may be subject to modification in any cash collateral stipulation or order authorizing the use of cash collateral. In that event, OWNER will promptly notify the MANAGER and MANAGER agrees to abide by any such stipulation or order.

During each calendar year, MANAGER agrees to promptly inform OWNER in writing of any capital expenditure or increase in costs and expenses in excess of the amount budgeted for such items, and of decreases in revenue that were not foreseen during the budget preparation period and thus were not reflected in the Budgets, and shall upon request of OWNER submit to OWNER for approval a revised Operating Budget or Capital Budget, as the case may be, based upon said unforeseen costs and expenses.

4 **Capital Expenditures**. With respect to the purchase and installation of major items of new or replacement equipment (including, without limitation, elevators, heating or air-conditioning equipment, furniture and furnishings, carpets or other floor

coverings), MANAGER shall recommend that OWNER purchase these items when MANAGER believes such purchase to be necessary or desirable. OWNER may arrange to purchase and install the same itself or may authorize MANAGER in writing to do so subject to such supervision and specification requirements and conditions as OWNER may prescribe in any such written approval. OWNER may pay for capital expenses from its own resources or may authorize payment out of the Operating Account (as hereinafter defined). Unless OWNER specifically waives such requirements in writing, all new or replacement equipment shall be awarded on the basis of competitive bidding, solicited in the following manner:

4.1 A minimum of two written bids will be obtained for each purchase greater than Three Thousand Dollars ($3,000) but less than Five Thousand Five Hundred Dollars ($5,000). A minimum of three written bids will be obtained for each purchase in excess of Five Thousand Five Hundred Dollars ($5,000) with bid bonds, if applicable or prudent. MANAGER shall be responsible to prudently select a provider of goods and/or services for expenditures less than Three Thousand Dollars ($3,000) in the aggregate for the goods and services to be supplied.

4.2 MANAGER shall provide OWNER with all bid responses accompanied by MANAGER's recommendations as to the most acceptable bid. If MANAGER advises acceptance of other than the lowest bidder, MANAGER shall adequately support, in writing, its recommendations.

4.3 OWNER will approve or disapprove any and all bids and will communicate to MANAGER, either verbally or in writing, of its approval or disapproval of bids within five (5) business days. If OWNER does not communicate any response to MANAGER within fifteen (15) business days, such bids shall be construed by MANAGER to be disapproved by OWNER.

5. **Operating Account**. MANAGER shall deposit, or cause to be deposited, all Gross Income From Operations of the Properties in one (1) or more depository accounts for the Properties at a reputable bank or financial institution ("Bank") which shall be maintained by MANAGER for the benefit of Owner (such accounts, together with any interest earned thereon, shall collectively be referred to herein as the "Operating Account"). "Gross Income From Operations" means all income, computed in accordance with GAAP, derived from the Ownership and operation of the Properties from whatever source, including the rents, rent subsidies, housing assistance payments, utility charges, escalations, forfeited security deposits, interest on credit accounts, service fees or charges, license fees, parking fees, rent concessions or credits, but excluding sales, use and occupancy or other taxes on receipts required to be accounted for by Owner to any governmental authority, refunds and uncollectible accounts, sales of furniture, fixtures and equipment, insurance proceeds (other than business interruption or other loss of income

insurance), any compensation paid by any governmental authority with respect to a partial or complete condemnation, unforfeited security deposits, utility and other similar deposits and any disbursements to Owner from the Reserve Funds. MANAGER shall maintain books and records of the funds deposited in and withdrawals from the Operating Account. From the Operating Account, MANAGER shall pay the operating expenses of the Properties and any other payments relative to the Properties as required by this Agreement.

6. **Security Deposit Account**. If applicable law or Lender requires a segregated account of Tenants' (as defined hereafter) security deposits, MANAGER will open a separate account at a reputable bank or other financial institution. MANAGER may return such deposits to any Tenant in the ordinary course of business in accordance with the terms of the applicable lease.

7. **Access to Account**. As authorized by signature cards, representatives of MANAGER shall have access to and may draw upon all funds in the accounts described in Sections 5 and 6 without the approval of OWNER or Owner.

8. **Additional Operating Funds**. In the event MANAGER determines that the funds generated by the Properties will be insufficient to meet the cash expense requirements for the next month, MANAGER shall submit a written request to OWNER setting out the anticipated income and expenses for the next month and the amount of additional funds necessary to operate the Properties.

9. **Emergency Funds**. Except as provided in Section 16, in the event there is an emergency concerning the Properties which requires additional funds, MANAGER shall submit a written request to OWNER and Owner setting out the facts concerning said emergency and the amount of money necessary to cure said emergency.

10. **Expense of Owner**. All obligations and expenses incurred hereunder shall be for the account of, on behalf of, and at the expense of Owner. Except as provided in Section 14 below, Owner will not be obligated to reimburse MANAGER for any salaries of employees of MANAGER. All payments to be made by MANAGER under this Agreement shall be paid from funds deposited in the Operating Account pursuant to the terms of the Loan Agreement. MANAGER shall not be obligated to make any advance to or for the account of Owner or to pay any sums, except out of funds held in the Operating Account, nor shall MANAGER be obligated to incur any liability or obligation for the account of Owner without assurance that the necessary funds for the discharge thereof will be provided.

11. **Legal Proceedings**. With OWNER's and the affected Owner's prior written consent, in each instance, MANAGER may initiate legal proceedings such as, without limitation, collections, enforcement of contracts, labor and employment matters, and proceedings against the Properties' tenants ("Tenants"), where the affected Owner shall

have the right to participate in such proceedings. During OWNER's bankruptcy case, the retention and compensation of any such professional will be subject to approval by the Bankruptcy Court. MANAGER shall timely forward all claims arising out of the operation of the Properties which are covered in whole or in part by insurance to the appropriate insurer and shall notify OWNER and the affected Owner of all claims in connection with the Properties as to which it has knowledge. For this purpose, MANAGER is authorized to execute notices to vacate and bring actions for eviction and judicial pleadings incident to such actions and follow such instructions as OWNER or the affected Owner may prescribe for the conduct of any such action. Attorney's fees and other necessary costs incurred in connection with such actions will be paid out of the Operating Account as the affected Property's expenses and in accordance with the Budgets. MANAGER shall not knowingly commit any act, or fail to act, in any manner that would result in a default under this Agreement, and shall promptly notify OWNER and the affected Owner in writing of any such default which comes to the attention of MANAGER. Additionally, MANAGER shall immediately give written notice to OWNER of any legal action or other proceedings relating to the Properties (other than suits against Tenants for rent, security deposits or evictions) and any other reports requested by OWNER.

12. **Leasing Guidelines**. As appropriate, and if in the absence of any designated 3rd party leasing broker, MANAGER shall prepare written leasing and operating guidelines setting forth, without limitation, the specific unit or commercial space rents and terms MANAGER recommends using at the Properties which may be in the Budgets. These guidelines shall be submitted to OWNER for written approval in such form and within a time frame acceptable to OWNER. MANAGER shall abide by only those leasing and operating guidelines which have been approved in writing by OWNER (the "Leasing Guidelines"). MANAGER shall make every reasonable effort to lease space now or hereafter becoming vacant in accordance with the Leasing Guidelines.

13. **Marketing and Advertising**. As appropriate and in the absence of any designated 3rd party leasing broker, MANAGER shall arrange and contract in the name and for the account of Owner all marketing and advertising necessary for the purpose of promoting the name and business of the Properties consistent with the Budgets. Further, MANAGER shall advertise and market the Properties, or portions thereof, prepare and secure advertising signs, space plans, circular matter and other forms of advertising; provided, however, that MANAGER shall not use Owner' name in any advertising or promotional material without Owner' express prior written approval in each instance; and provided further that advertising and promotional materials shall be prepared and used in full compliance with federal, state and municipal laws, ordinances, regulations and orders. All costs and expenses for marketing and advertising shall be made in accordance with the Budgets and shall be paid from the Operating Account.

14. **Employment of Personnel**. MANAGER shall investigate, hire, train, pay, supervise, and discharge the personnel necessary to be employed in order to properly and

adequately maintain and operate the Properties. Such personnel shall in every instance be deemed employees of MANAGER and not of any Owner, who shall have no right to supervise or direct such employees. MANAGER shall be bonded with Owner listed as a payee on each of its respective reimbursement checks. MANAGER shall be responsible to OWNER and Owner for all such employees. All matters pertaining to the employment, supervision, compensation, promotion and discharge of MANAGER's employees and others engaged by MANAGER for the operation and/or maintenance of the Properties are the responsibility of MANAGER.

15. **Service Contracts**. MANAGER shall negotiate and execute, in Owner's name and in accordance with the Operating Budget, contracts for water, electricity, gas, telephone, vermin extermination, trash removal and other necessary services approved by OWNER in the Operating Budget and deemed by MANAGER to be necessary or advisable for the operation of the Properties, and all such contracts shall include a provision for cancellation by OWNER or MANAGER effective upon thirty (30) days written notice and for a term not to exceed one (1) year; and shall require that all contractors provide evidence of sufficient liability and worker's compensation insurance acceptable to OWNER. MANAGER shall also place orders in Owner' names for such equipment, tools, appliances, materials and supplies as are approved by OWNER in the Operating Budget and are reasonable and necessary to maintain the Properties properly and adequately. No such contracts will be recorded without the prior written consent of Owner.

16. **Maintenance and Repair of Properties**. Subject to any necessary authorization by the secured creditors to pay for maintenance and repair or approval by the Bankruptcy Court for such expenses, MANAGER shall maintain and operate the buildings, appurtenances and grounds of the Properties (a) in accordance with federal, state and municipal laws, ordinances, regulations and orders; (b) in accordance with the rules, regulations and orders of the local fire inspection department, the agency or board of casualty insurance underwriters or similar body; and, (c) in accordance with standards acceptable to OWNER, including within such maintenance, without limitation thereof, interior and exterior cleaning, painting and decorating, plumbing, carpentry, and such other normal maintenance and repair work as may be necessary and/or desirable. The cost to accomplish such maintenance and repairs shall have been approved in, and fall within, the Operating Budget, excepting, however, that emergency repairs immediately necessary to protect life and limb, reduce the severity of loss, and secure any of the Properties may be made by MANAGER without the prior written approval of OWNER; provided, however, that any such emergency situation shall be made known to OWNER and the affected Owner immediately by telephone (unless the emergency situation arises at a time that OWNER or the affected Owner is not open for business, in which case notice by telephone shall be given as soon as OWNER or the affected Owner is next open for business) and written notice shall be given to OWNER and the affected Owner within forty-eight (48) hours of such occurrence. Disbursements for actual and reasonable expenses for such maintenance and repair shall be made from the Operating Account.

17. **Insurance and Indemnity**.

17.1 OWNER shall cause to be placed and kept in force on the Properties all forms of property and liability insurance required by law and the Loan Documents or needed to adequately protect Owner; such insurance may be under OWNER's or Owner's blanket insurance coverage. All insurance coverage shall be placed with such companies, in such amounts, and with such beneficial interest appearing therein as shall be acceptable to OWNER and otherwise be in conformity with the requirements of the Loan Documents, including any mortgages on the Properties. MANAGER shall be included on OWNER's or Owner' general liability insurance policy as an additional insured.

17.2 OWNER and MANAGER hereby mutually waive their respective rights of recovery against each other for any loss insured by fire, extended coverage, and other property insurance policies existing for the benefit of the respective parties; each party shall obtain any special endorsements if required by their insurer to evidence compliance with the aforementioned waiver.

17.3 Except for MANAGER's, or its agents', gross negligence or willful misconduct, OWNER shall defend and indemnify MANAGER against all third party claims, damages, liabilities, costs and attorney's fees arising out of MANAGER's actions taken within the scope of the agency established by this Agreement.

17.4 MANAGER agrees to not knowingly permit the use of the Properties for any purpose which might void any policies of insurance relating to the Properties or which might render any loss thereunder uncollectible, or which would be in violation of any law or governmental restriction.

17.5 MANAGER shall maintain in the name of MANAGER, and at MANAGER's expense, the following insurance policies with insurance companies acceptable to OWNER or with a Best's Rating of A: IX or better, and which shall include a provision for thirty (30) days prior written notice to SAPMC of cancellation or material change with no exceptions, and shall, prior to commencement of services, provide to OWNER certificates of insurance evidencing the following coverages:

17.5.1 Comprehensive General Liability coverage for bodily injury and property damage liability, including broad-form comprehensive general liability endorsement, or Commercial General Liability/occurrence-basis, written on forms acceptable to OWNER, for a combined single limit of at least Two Million Dollars ($2,000,000) per occurrence. OWNER and Owner shall be named, by endorsement, as additional insureds on such policy.

17.5.2 Automobile Liability covering MANAGER's owned, hired and non-owned autos, with a combined single limit in the amount of Two Million Dollars

($2,000,000) per occurrence for bodily injury and property damage liability; and naming OWNER and Owner, by endorsement, as additional insureds.

17.5.3 Worker's Compensation for statutory limits, and Employer's Liability coverage in an amount of not less than One Million Dollars ($1,000,000), for MANAGER's employees and including a waiver of carrier's right to subrogate against OWNER or Owner.

17.5.4 Fidelity Bond including Depositor's Forgery, in the amount of not less than One Hundred Thousand Dollars ($100,000) per occurrence. Coverage shall include Owner' liability for funds collected on behalf of Owner.

18. **Collection of Monies**. MANAGER shall collect all monies in accordance with this Agreement and the Leasing Guidelines or, when due, all rent and other charges due from Tenants, lessees of other non-dwelling facilities on the Properties, concessionaires and otherwise due Owner with respect to the Properties in the ordinary course of business. OWNER authorizes MANAGER to request, demand, collect, receive and receipt for all such rent and other charges and, only with OWNER's prior written approval, to institute legal proceedings in the name of the Owner under the provisions of Section 11 hereof. MANAGER will arrange for credit card processing services as needed and the cost of discount fees and chargebacks shall be applied to the Operating Account. All monies collected by MANAGER shall be forthwith deposited in the Operating Account.

19. **MANAGER Disbursements**. MANAGER shall cause to be disbursed from the Operating Account when due regularly and punctually (a) MANAGER's compensation; and, (b) the operating expenses of the Properties. During the pendency of the OWNER's bankruptcy case, all such disbursements are subject to the consent of the OWNER's secured creditors or approval by the Bankruptcy Court.

20. **Records**. All statements, receipts, invoices, checks, receiving reports, leases, contracts, worksheets, financial statements, books and records, and all other instruments and documents relating to or arising from the operation or management of the Properties shall be and remain the property of OWNER and Owner. MANAGER shall prepare the same in a detailed manner acceptable to OWNER, and MANAGER shall keep and maintain the same in a safe place for a period of five (5) years or until delivered to OWNER or Owner. OWNER and Owner shall be entitled to inspect, review and audit such records at any time during normal business hours. All such records shall be delivered to OWNER or Owner upon the termination of this Agreement.

21. **Monthly Reports**. On or before the fifteenth (15th) day of each month during the Term, MANAGER shall deliver to OWNER a statement of cash receipts and disbursements, a financial statement (cash or modified accrual basis as may be requested

by OWNER) and such other financial/management reports as may be reasonably required by OWNER, for the immediately proceeding fiscal month. A "fiscal month" shall mean any current month, ending for financial statement purposes as of the last day of that month.

22. **Returns Required by Law**. MANAGER shall execute and file punctually when due all forms, reports and returns required by law relating to the employment of personnel. Owner shall be responsible for filing any income tax or other returns.

23. **Compliance with Legal Requirements**. MANAGER shall take such action as may be necessary to comply with any and all orders or requirements affecting the Properties by any federal, state, county or municipal authority having jurisdiction thereover, and orders of the Board of Fire Underwriters or similar bodies, subject to the limitation contained in Section 16 in connection with the making of alterations and repairs. MANAGER, however, shall not take any such action as long as OWNER is contesting, or has affirmed its intention to contest and institutes proceedings contesting, any such order or requirement, except that if failure to comply promptly with any such order or requirement would or might expose MANAGER to criminal liability, MANAGER shall notify OWNER and OWNER shall approve such expenditure or make other arrangements to timely comply with such order in order that MANAGER shall not suffer any such liability. MANAGER shall promptly, and in no event later than forty-eight (48) hours from the time of its receipt, notify OWNER in writing of all such orders and notices or requirements.

24. **Service of Process**. MANAGER is not authorized and shall not accept service of process or citation for violation of any code, ordinance, regulation or law for OWNER.

25. **Disclosure**. MANAGER shall disclose to OWNER in advance in writing any and all relationships, and the nature and extent thereof, of MANAGER to any other party with whom MANAGER contracts, for itself or on behalf of OWNER or Owner, in connection with the operation, maintenance and repair of the Properties. Further, MANAGER may not contract for any services or supplies in connection with the operation, maintenance and repair of the Properties with any affiliated agencies unless MANAGER demonstrates that the prices and terms (including continuity, punctuality and reliability of contract performance) of such goods and services in connection with the operation, maintenance and repair of the Properties are at least as favorable with the prices and terms of goods and services of equal quality available from other reputable suppliers and contractors.

26. **Licenses and Permits**. MANAGER shall take all necessary steps for the procurement of all licenses and permits required for the operation of the Properties and its related facilities, and MANAGER shall assist Owner in the application and processing of such licenses and permits.

27. **Inspection**. Within thirty (30) days following the date of this Agreement, MANAGER shall, if requested by OWNER, conduct a physical inspection of the Properties and deliver to OWNER, for OWNER's review and approval, a complete inventory of the Properties.

28. **Property Management Fee**. For the complete performance of the services described herein, MANAGER's compensation shall be the payment by OWNER to MANAGER of four percent (4.0%) of the Gross Income From Operations or $4,000 per month whichever is greater ("Property Management Fee"), however the monthly minimum fee for the first 90 days shall be $5,000 per month.

Manager is not the exclusive broker or listing broker for the sale of the Project, or any part thereof. In the absence of any designated leasing broker employed or assigned by owner, Manager shall act as leasing agent under the following commission guidelines:

a. New lease @ 6% if co-brokerage;

b. New lease @ 4% if sole broker;

c. Lease renewal @ 2%

d. Assignment of Lease @ $500 (tenant pays)

e. Minimum Lease Commission $1,000

Manager's roving maintenance personnel which are not dedicated solely to the Project are billed at $75/hour.

29. **Construction Management Fee**. If extraordinary repairs are made to the Properties and OWNER requires additional supervisory work from MANAGER that is out of the ordinary scope of monthly management services (e.g., one (1) of the Properties is extensively reconstructed or rehabbed, or the MANAGER is required to perform services not described herein), then MANAGER shall receive an additional construction management fee of five percent (5%) of the rehabilitation costs. MANAGER and OWNER agree that prior to performing or arranging any service or activity which would result in such additional compensation, MANAGER shall have given written notice thereof to OWNER, and such performance, arrangement, and additional compensation shall first be authorized by OWNER in writing.

30. **Set Up and Closing Management Fee**. MANAGER shall receive a one time set up fee of $3,000. Management fees will continue for one full month following the termination of this agreement to compensate MANAGER for final close out work, termination of contracts and wrap up of financial reporting. MANAGER shall not receive such fee if this Agreement is terminated because of a breach of contract by MANAGER.

31. **Use and Maintenance of Properties**. It shall be the duty of the MANAGER at all times during the term of this Agreement to operate and maintain the Properties according to the highest standards achievable consistent with the expressed plan of OWNER. MANAGER shall use its best efforts to secure full compliance by the Tenants with the terms and conditions of their respective leases. MANAGER shall be expected to perform such acts and deeds as are reasonable, necessary and proper in the discharge of its duties under this Agreement.

32. **Termination**. Notwithstanding anything to the contrary contained herein, (i) at any time during the Term, OWNER and MANAGER may terminate this Agreement by giving thirty (30) days advance written notice to the other party without the necessity of establishing cause; (ii) this Agreement shall automatically terminate upon the sale of the Properties or any portion thereof (in which event only as to such portion of the Properties sold); (iii) OWNER may terminate this Agreement immediately in the event of a breach of this Agreement by MANAGER or in the event of MANAGER's misconduct by giving written notice of such termination to MANAGER, and upon such termination, in addition to all other rights and remedies OWNER may have, MANAGER shall not be entitled to receive any further compensation as of the date of MANAGER's receipt of such written notice of termination; and (iv) in the event OWNER is in default in the performance of any of its obligations hereunder, and such default remains uncured for thirty (30) days following MANAGER's giving of written notice of such default to OWNER, MANAGER shall have the right to terminate this Agreement upon thirty (30) days written notice to OWNER. Upon OWNER terminating this Agreement pursuant to subsections (i), (ii) and (iv) of this Section 32, OWNER shall pay to MANAGER as its sole and exclusive compensation, that portion of the Property Management Fee earned to the date of termination, less any amounts previously received by MANAGER.

33. **Obligations of Parties Upon Termination**. Within thirty (30) days after any termination, MANAGER shall deliver to OWNER the written report required by Section 21 herein for any period not covered by such a report at the time of termination, and within forty-five (45) days after any such termination, MANAGER shall deliver to Owner, as required in Section 21 herein, the financial statement for the fiscal year or portion thereof ending on the date of termination. All deposits and funds in the Operating Account or in MANAGER's possession shall immediately be remitted to OWNER (or, if so directed by OWNER, to MANAGER's replacement). Immediately upon termination of this Agreement for any reason, MANAGER shall deliver to OWNER all records, contacts, leases, receipts for deposits, unpaid bills, a computer printout of all computerized records and all other papers or documents which are in MANAGER's possession or under MANAGER's control and which relate to the Properties.

34. **Assignment**. OWNER or Owner may assign its rights and obligations hereunder to any assignee. MANAGER may not assign its rights and obligations hereunder without the advance written consent of Owner which consent shall not be unreasonably withheld.

35. **Notices**. All notices, requests, demands or other communications under this Agreement shall be in writing. Notice shall be sufficiently given for all purposes as follows: (a) when personally delivered to the recipient; notice is effective upon delivery; (b) when mailed first class to the last address of the recipient known to the party giving notice; notice is effective three (3) mail delivery days after deposit in a United States Postal Service office or mailbox; (c) when mailed certified mail, return receipt requested; notice is effective upon receipt, if delivery is confirmed by a return receipt; (d) by overnight delivery using a nationally recognized overnight courier, charges prepaid or charged to the sender's account; notice is effective upon delivery, if delivery is confirmed by the delivery service; or (e) when sent by telex or facsimile to the last telex or fax number of the recipient known to the party giving notice; notice is effective upon receipt, provided that (i) a duplicate copy of the notice is promptly given by first-class or certified mail or by overnight delivery, or (ii) the receiving party delivers a written confirmation of receipt; any notice given by telex or facsimile shall be deemed received on the next business day if it is received after 5:00 PM (recipient's time) or on a nonbusiness day. Any correctly addressed notice that is refused, unclaimed, or undeliverable because of an act or omission of the party to be notified shall be deemed effective as of the first date that said notice was refused, unclaimed, or deemed undeliverable by the postal authorities, messenger or overnight delivery service. Any party may change its address, telex or fax number by giving the other party notice of the change in any manner permitted by this Agreement.

Addresses for purposes of giving notice are as follows:

| | |
|---|---|
| If to OWNER,<br>addressed to: | Howard Grobstein<br>Manager<br>Raymond Group LLC<br>6300 Canoga Ave., Suite 1500W<br>Woodland Hills, CA 91367<br>818-532-1020<br>hgrobstein@gtllp.com |
| With a copy to: | Kyra Andrassy<br>Partner<br>Raines Feldman Littrell LLP<br>4675 MacArthur Ct, Suite 1550 Newport Beach, CA 92660<br>(424) 239-2510<br>kandrassy@raineslaw.com |

If to MANAGER
Addressed to:

Robert C. Warren III
President
Investor's Property Services
26300 La Alameda, Ste 240
Mission Viejo, CA 92691
Attention: Robert C. Warren III
949-900-6161
Robert.warren@investorshq.com

36. **Entire Agreement**. This Agreement contains the entire agreement between the parties hereto, and supersedes any prior written or oral agreement between said parties concerning the subject matter contained herein. There are no representations, agreements, arrangements or understandings, oral or written between and among the parties hereto, relating to the subject matter contained in this Agreement, which are not fully expressed herein.

37. **Governing Law**. The validity, interpretation, construction and performance of this Agreement shall be controlled by and construed under the laws of the State of California, without giving effect to principles of conflict of law thereof. In the event of any litigation arising out of any dispute in connection with this Agreement, the parties hereby consent to the jurisdiction of the California courts. Notwithstanding the foregoing, during the OWNER's bankruptcy case, the U.S. Bankruptcy Court, Central District of California, Santa Ana Division, shall have sole and exclusive jurisdiction over any disputes.

38. **No Recording**. Unless required by Lender, this Agreement shall not be filed of record in the deed, deed of trust, real property or other records in any county or office in any state.

39. **MANAGER's and OWNER's Liability**. MANAGER shall be liable to OWNER for all losses, damages, liabilities, actions, proceedings, claims, fines, penalties, costs and expenses, including without limitation attorney's fees and court costs, sustained or incurred by OWNER by reason of or arising out of MANAGER's breach of the duties and obligations required by this Agreement. OWNER shall be liable to MANAGER for all losses, damages, liabilities, actions, proceedings, claims, fines, penalties, costs and expenses, including without limitation attorney's fees and court costs, sustained or incurred by MANAGER by reason of or arising out of OWNER's breach of the duties and obligations required by this Agreement.

40. **Sale of Properties**. If OWNER so requests, MANAGER shall cooperate with any and all brokers specified by OWNER to the end that the respective activities of MANAGER and broker(s) may be carried on without friction and without interference with Tenants and occupants. MANAGER will permit the broker to exhibit any of the Properties during reasonable business hours provided the broker has notified MANAGER in advance. MANAGER agrees that failure on its part to extend cooperation to a broker(s) desiring to show any of the Properties is a material default on its part under this Agreement and is a ground for termination of this Agreement immediately upon written notice to MANAGER. MANAGER shall be entitled to a flat fee of Two Thousand ($2,000) upon close of escrow for work performed as it relates to the coordination and sales efforts in excess of typical property management operations.

41. **Audits**. OWNER or Owner may examine or audit or cause to be examined or audited any and all books, records, computer software or other materials maintained by MANAGER with respect to the operation, management, maintenance, or repair of the Properties, either at the Properties or at any office of MANAGER.

42. **Attorneys' Fees**. With regard to any action or proceeding between the parties arising from or relating to this Agreement or the enforcement or interpretation hereof, the party prevailing in such action or proceeding shall be entitled to recover from the other party all of its reasonable attorneys’ fees and other costs and expenses of the action or proceeding.

43. **Applicability of Agreement**. It is understood and agreed that (a) the provisions of this Agreement shall apply to each of the Properties described on **Exhibit A** as if each Property has a separate management agreement, and (b) the parties hereto may act in any manner that is authorized by this Agreement with respect to any one (1) Property without affecting any of the other Properties.

44. **Confidentiality**. MANAGER shall regard all information relating to the Properties and all information supplied to MANAGER by OWNER, lenders or any of its employees or agents as confidential and proprietary information of OWNER and/or Owner, and shall not permit its release to other parties without OWNER's prior written authorization.

45. **Force Majeure**. Neither party shall be liable to the other in damages nor shall this Agreement be terminated nor a default be deemed to have occurred because of any failure to perform hereunder caused by a "Force Majeure". In this Agreement, the term "Force Majeure" shall mean an event, such as, but not limited to, fire, earthquake, flood, explosion, casualty, strike, unavoidable accident, riot, insurrections, civil disturbance, act of public enemy, embargo, war, act of God, inability to obtain labor, materials or supplies, any outbreak of disease, and any governmental regulation, restriction or prohibition, or any other similar cause beyond the parties' control.

46. **Standard of Operation**. MANAGER agrees to manage and operate the Properties in the name and for the account of Owner, in accordance with the terms of this Agreement and in regular, continuous and substantial consultation with OWNER, and MANAGER hereby agrees to furnish such management and operational skills in such a manner to protect, preserve, and enhance the financial return to Owner. MANAGER shall operate the Properties considering the physical characteristics of the Properties and the quality level, marketing mix and other matters set forth in the Budgets, and shall provide or cause to be provided all amenities in connection therewith which are customary and usual to such an operation.

47. **Meetings**. OWNER and MANAGER shall meet regularly upon OWNER's request, at mutually agreeable times and places, for the general purpose of consultation and advisement as to Properties' operating plans for the balance of the fiscal year and all other material aspects of Properties' performance, including without limitation, operations and management of all material policies and procedures affecting all material phases of the conduct of business at the Properties. MANAGER shall consult with and seek advice from OWNER prior to MANAGER effectuating any policies or procedures.

***[Remainder of Page Intentionally Left Blank; Signature Page Follows]***

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the date and year first above written.

**"OWNER"**

RAYMOND GROUP, LLC

By: Signed by: Howard Grobstein 468FC6C9A58046E...
Howard Grobstein
In his sole capacity as Manager

**"MANAGER"**

R & K INTERESTS, INC., a California Corporation doing business as INVESTORS' PROPERTY SERVICES

By: DocuSigned by: Robert C. Warren III 5C96EAD0E9194DB...
Robert C. Warren III,
President

# EXHIBIT A

## DESCRIPTION OF PROPERTIES

Raymond Group, LLC
Commercial properties consisting of retail and office product
Approximately 78,848 sq ft.

104-172 North Raymond Avenue
Fullerton, CA 92831

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
4675 MacArthur Court, Suite 1550, Newport Beach, CA 92660

A true and correct copy of the foregoing document entitled (*specify*):
**MOTION PURSUANT TO 11 U.S.C. § 363(b) TO ENTER INTO PROPERTY MANAGEMENT AGREEMENT WITH R & K INTERESTS, INC. DBA INVESTORS' PROPERTY SERVICES AS PROPERTY MANAGEMENT COMPANY EFFECTIVE JUNE 1, 2026; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF HOWARD GROBSTEIN IN SUPPORT THEREOF**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **June 30, 2026**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*) _________ I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **June 30, 2026**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**Federal Express**
Hon. Scott C. Clarkson
U.S. Bankruptcy Court
Ronald Reagan Federal Building
411 West Fourth Street, Suite 5130
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 30, 2026 | Bambi Clark | /s/ Bambi Clark |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- **Kyra E Andrassy kandrassy@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com**
- **Jessica L Bagdanov jbagdanov@bg.law, ecf@bg.law**
- **Michaela C Crocker michaela.crocker@katten.com, courtalertlax@katten.com**
- **Dora Duru dora.duru@bclplaw.com, verlisa.lewis@bclplaw.com**
- **William B Freeman bill.freeman@kattenlaw.com, nicole.jones@kattenlaw.com,ecf.lax.docket@kattenlaw.com**
- **David B Golubchik dbg@lnbyg.com, dbg@lnbyg.com**
- **Steven T Gubner sgubner@bg.law, ecf@bg.law**
- **Golsa Honarfar ghonarfar@rutan.com, avaccaro@rutan.com;apineda@rutan.com**
- **Robert S Marticello rmarticello@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com**
- **Kenneth Misken Kenneth.M.Misken@usdoj.gov**
- **Arlen Moradi arlen.moradi@katten.com, courtalertlax@katten.com**
- **Stephen M. Mott smott@raineslaw.com, csantiago@raineslaw.com;bclark@raineslaw.com**
- **David M Poitras dpoitras@bg.law**
- **David James Root david.root@bclplaw.com, verlisa.lewis@bclplaw.com**
- **Joseph M Rothberg jmr@lnbyg.com, jmr.LNBYG@ecf.inforuptcy.com**
- **Martin W Taylor marty.taylor@bclplaw.com, shawn.williams@bclplaw.com**
- **United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov**
- **Christopher A Ward cward@lowenstein.com, lsuprum@lowenstein.com**
- **Sharon Z. Weiss sharon.weiss@bclplaw.com, raul.morales@bclplaw.com,sharon-weiss-7104@ecf.pacerpro.com**